Please the court. My name is Andrew Jacoby and I represent the appellant Cedar Lodge Plantation, L.L.C. I'd like to address two types of claims here. The entirety of the claims, I think, they can be separated into two categories. The first would be... Do you want to speak up a bit, please? Sure, I'm sorry. The first set of claims would be the lost business damages claim. And I think the second would be the ongoing property damage claims. And so I'd like to address those one at a time, starting with the lost business damages claim. After denying defendants two motions for summary judgment on this, the court reconsidered on a motion for reconsideration, and they ruled in favor of the defendants. The standard here is a de novo review. The standard of liability here is simply whether a reasonable jury could find that a substantial factor in causing the collapse of the development deal was the defendant's contamination of the Cedar Lodge Plantation. What's the status of the development right now? It's ended. It ended at that time. Okay, and I'm looking at a photo from the record of the overview of your client's plot vis-a-vis the apartment house. Was this pond just a pond that was created with rainwater, or did it have spring or stream flow or something? It's at least several decades old because it's family property, and he recalls using that even as a kid. I'm not sure if it was initially artificial at the time. Well, but it's not spring-fed, and it does not have some external source of new water coming into it? It does from the Fairway View ditch drains into the pond, and some of the pond water drains out the other side of the pond into Ward's Creek. And that rainwater, the stormwater that comes in via the Fairway View ditch, includes rainwater both from the Fairway View apartments and also from a golf course. Is that the only source of water going into the pond? That's what our allegations are. The defendants have alleged that some water that's right there on the property has also gone into the pond. So prior to whenever this sewage problem arose, you were actually benefiting from the Fairview apartment drainage ditch? I don't think so because it's not a very large drainage that goes into it. Well, let me tell you what my problem here is. I thought that in order to have a real fish pond, you had to have some way to aerate the water so that there was an oxygen supply coming in. Otherwise, the whole thing gets covered in algae, and that kills the animals underneath. So, you know, your client alleges that in December of 2012 it was clear and there were big fish, and I was just wondering how the big fish managed to survive in a pond that had no other oxygen source. I believe that it was the opposite. It had been a healthy fish farm, and it had been used for fishing previously, and that when he discovered in December 2009 that he discovered that the pond was dead, it smelled dead and it looked dead was his discovery there, and that was confirmed by the sampling taken at the time that found that sewage had contaminated that pond at six times the public health safety standard. And where is that sampling evidence in the record? I mean, because there are various samplings. It's the December 2002 sampling. 2002 or 2012? I'm sorry. 2012, yes. And Mr. Witter talks about it right around 2940 and 2950. It's attached to plants expert Suresh Sharma's report. It's the report of Sidney Marlborough. You mean Sharma is incorporating the report of someone else? He does incorporate it. I'm just thinking that that's one of the places that it exists. Now, Mr. Witter, he testified that he went out and he got this report done by Sidney Marlborough, whose presence in the litigation has not been challenged for trial. And when he received this report, this is long before Mr. Sharma was hired because it was long before the or at least it was a month before the litigation got going. Additionally, to speak to the one other point you mentioned about where the development project was at, that property cannot be put back into commerce until this contamination issue is addressed. And so while it's not that particular project that would probably happen, it would be something different, but it cannot be put back into commerce. It's contaminated now as we sit here today? It is, yes. Okay, but you also didn't, did you brief the issue on the remediation? I mean, you had a remediation claim. We did, and there's a little bit of a blurring of remediation and restoration. And under the civil code provisions, we are entitled to restoration as long as there are contaminants that the defendant has discharged onto our property. Remediation is more suggestive of state standards under the state environmental regulatory regime. So the project is dead and you seek monetary damages for that. Yes. But you also seek either remediation to get the pond back into a suitable condition where the property can be put in commerce. Yes. We seek compensation for the lost business damages claims. We seek restoration of the pond from the pond damage, which is acknowledged by the court that there are heavy metals and fecal coliform that's there in the project. We also seek an injunctive to prevent them from discharging further. Now, your expert tested the water. Did the defendant's expert also test the water? The March 2015 testing, I'm going to have to pull that up. I can't recall if that was by their experts or our experts because there were some dueling expert sampling that went on here. But, by the way, that March 2015 found 11 of the 17 constituents that they sought. It didn't happen to reach the level of the state recap standards, but they did find those sewage contaminants there in the pond. Fecal material. They found fecal coliform, an indication of raw sewage. Let me ask you a question about that  And there is always fecal coliform. Yes. And that's treated water. But the EPA has standards for it, and so the level is always below the EPA standard. Now, at what point and for how long, if at all, did your water testing exceed? Are you saying that your state standard is irrelevant to your claim? I guess there are two questions there. Yes, there probably are. First, they originally found the fecal coliform at six times the public health safety standard. When was that? And that was the December 2012, and that's what we're alleging caused the development deal to collapse because that was that discovery in 2012. Right. Now, it's not an indication of treated sanitary wastewater. In this instance, it was untreated, and it's really a count of live bacteria in the fecal coliform. Both sides' experts agree that the live bacteria dies off and that it remains. And I want to just, if I can, quote the defendant's own expert on this, and it says that he said that fecal coliform and heavy metals have come from the Fairway View ditch into the Cedar Lodge pond. That's at 2828. That sewage and other solid waste, including solids, condoms, tampons, and various products remains despite the die-off of fecal coliform, and that fecal coliform gets embedded into the sediment and stays behind. That's at 2808 and 2865. Well, I understand that as a theoretical matter, but we're now six years down the road from December of 2012. Yes. And how long did this mean? Presumably the fecal coliform are all dead. And when you're saying a restoration, your claim is that they have to dredge the pond. Is that what you're saying? We're saying that the restoration, they will have to dewater the pond, and they will have to address the sewage contamination that's settled into the pond bed. But our allegation is also that there continues to be discharges, and that's strongly corroborated by the evidence. But I thought that the tests more recently were well below the state standards. The tests recently, there is an exceedance of arsenic under RECAP and under lead and chromium under TCLP standards. Well, that's hardly sewage, right? I've had arsenic cases. And people aren't going to be drinking this water. That is sewage. And they're not going to be fishing for the fish and eating the fish. We think that they should not be allowed to contaminate our pond to the point of us not being able to use it for fishing. But the heavy metals are an indication of raw sewage contamination. And because you use household cleaners. But if the fecal coliform are well below, then the heavy metals are not an indication of raw sewage, right? And we think that the fecal coliform is periodically spikes higher than that. There's nothing to indicate that it's not. It's a very complicated theory. It's recognized in the case law, which shows that fecal coliform counts, they rise and fall as the live bacteria die off. Well, I'm sorry to spend so much time here, but this is a very factually intensive case with a very long record. So at this point, is it fair to say that you're up here solely on restoration and lost business opportunity? There's also sort of a separate claim there, and that's really the nuisance claim. And that's because we seek an injunction to force them to fix the problem. So restoration is a remedy, not a claim? Yeah. Restoration is a remedy that we should get from negligence. But what do you do with the fact that the judge said, first of all, I thought he indicated some doubt as to whether Louisiana law even has a nuisance claim. And then he said it's basically the same as negligence. And I have rejected your negligence claim. So why doesn't nuisance implicitly go along with that? Our nuisance claim is based under Articles 667 through 669 of the Civil Code. They're slightly different, but they are substantially overlapping. I think he said that they substantially overlap, and they do, but they don't require that it be currently contaminated. Otherwise, we would have to launch a lawsuit and complete it within the time that a pulse of bacteria dies off, which is days or a couple of weeks. What do the latest findings show, I mean? The latest findings are not in the record. And the latest findings that are in the record are, in March 2015, they found 11 of 17 heavy metal and fecal coliform constituents. And in 10 of the ‑‑ there were eight different locations that they sampled. In 10 of the 11, they found those highest at the spot right by where the You said that one finding was six times the safety level. Yes. Who puts that out? That was by Sidney Marlborough, who was contacted by Mr. Witter after he walked the property, smelled, and saw what was happening. And he came out. He sampled the pond in two places, both at the Fairway View Ditch and sort of more towards the center of the pond. And that's when they discovered how bad this problem was. Okay. Between that test and the 2015 test, what change, if any, had taken place? There was some slightly ‑‑ they sampled for heavy metals in the latter test, number one. So they sampled for heavy metals that you would find in household cleaners and things like that. And our experts have battled over the background and what's normal for a background of what you find in other lakes in the area. But they sampled for both fecal coliform. It was indeed lower, but, of course, it would be because the fecal coliform Let me ask you a dumb question. And I'm very sorry to ‑‑ I'm sorry. Did I interrupt? No. Why didn't you just build a levee? Build a levee to block their ditch from coming in? Right. I think it would be a very ‑‑ I don't know where that would go. It seems like the stormwater would have to come through us somehow. I mean, we'd naturally take stormwater. If the ditch is deeper or the wall on the side of your property is deeper, then the water is going to ‑‑ it might be able to percolate underground, but it certainly wouldn't be able to get up. I just wondered. Yeah, I think it would also be a violation of the servitude of drain laws because you're not allowed to construct something that obstructs the natural flow of drainage of stormwater onto your property. Well, let me go back. So you're acknowledging you've got the nuisance claim, which you acknowledge is substantially the same, and we just have to look at the record, I suppose, for what evidence, if any, you have that's different because I'm not quite clear on that. Business opportunity, you have the testimony of your client, and then on the rehearing opinion, Judge Jackson went pretty, I thought, carefully, whether it was comprehensive, I can't say, but it was carefully through deposition testimony and documents, and said, well, it was actually your client who forewent the opportunity to negotiate further because this other company, Harvest, I think, was offering to engage in remediation, and he said no. Is that not accurate? I think it's accurate that he did break off communications and that Harvest Partners, there's actually contradictory testimony of Harvest Partners about the causation there, but there can be more than one. Tell me who's the contradictory testimony. That would be the testimony of Harvest Partners in three places. The first, actually, is an e-mail in which they said that the contamination was, quote, due to the contamination, or I'm sorry, that the problem was due to the contamination issue. Testimony was that, well, we got ready to go, and there was an environmental issue, and we had to stop, and then even more direct was the testimony, the question, so you stopped this project because of an environmental issue? Yes, sir. That's right within the testimony that the judge cited. It's also strongly corroborated by the evidence. All of that, but again, I mean, did Harvest offer to engage in the remediation process for the pond? No, they just generally said they were willing to move forward. And importantly there is the timing of this. Actually, I think that the general analogy that I made in the brief is very similar. If you have a boyfriend and girlfriend, and a boyfriend cheats on the girlfriend, and she breaks off communications with him, can we really say that a reasonable jury could only find that the sole cause of the relationship's collapse was the breaking off of communication? No, there's reasons behind that. There are competing causes, and really his cheating would have been a competing cause. Well, but that's a adversarial relationship, and this is not an adversarial relationship when you're talking about Harvest being willing to move forward. Harvest is willing to move forward, but Mr. Witter has to make his own business decisions here, and his own business decision, he lives in the community. He wanted to live in the community and keep a lawsuit going for nine years, right? Can you imagine the headlines if you build a retirement community centered around a pond that he has later discovered that he knows was at one point, and there's no indication that this was the worst that it ever got, was at six times the public health safety standard. There's a liability risk associated with that, financial risk. Well, I think it's real amusing that on this project here, the assisted living and so on appears to be about 10% to 15% of the size of the entire project, and it's not as close to that pond. There's a bridge that goes over the pond. Even if it were a spy, it would be a negative if the pond stank. Well, there's an assisted living, but there's also a retirement center, and there's also the commercial center, and all three of those, you're talking about potential liability, not to mention the humiliation. There's financial risk along with the potential liability of having a health risk there. Was Mr. Litter a participant in this project, or was he just selling the property? No, he's a participant of it, and he's got a business guy, David Wolstetter, who also had testified and has the letters showing that he was going to, this goes to causation, was going to Fairway View and trying to get them to address the problem in late December 2012. The evidence of context here is strong corroborating evidence that a jury ought to be able to weigh. We're talking about an MSJ on causation. I know your time is out, but let me ask you, how critical to your opposition to this summary judgment is the expert testimony? Because we have the summary judgment rulings, and then we also have the expert witness rulings by the district judge. How much do you rely on the expert to combat and defeat the summary judgment motions? For the lost business damages claim, the expert testimony is not relevant because what we have is evidence that's sort of isolated there in December 2012, with the sole piece of evidence from any sort of expert would be the environmental guy that he hired, Sidney Marlborough, to come out, and his testimony has not been challenged. It's the restoration claims where we get into the property damage. But we feel that even if you remove those experts, we already have the expert testimony of their own defendant, which concedes that this sewage settles into the pond bed. Okay. Thanks. All right. Mr. Fors? Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Joshua Fors on behalf of the Fairway View Defendants. I'm going to take the first 15 minutes of the argument, and Mr. Bordelon will address the arguments regarding STS in the remaining five minutes. The district court correctly granted summary judgment and dismissed Cedar Lodge's claims because Cedar Lodge had absolutely no evidence, no evidence at all, that it suffered any damages as a result of alleged contamination of its property. I think the point to start, and this picks up on the questions that were asked of opposing counsel, is was there any evidence of the pond that the pond was contaminated? And the answer is that the latest testing of the pond demonstrated conclusively that the pond was not contaminated. Well, you don't deny that something had happened to it in December of 2012. Your Honor, we don't deny that the testing in 2012 showed an elevated level of fecal coliform. That's true. But we did dispute, and it's not relevant to the summary judgment motion, but in the context of the lawsuit, we disputed what the cause of that elevated level of fecal coliform was. What Cedar has argued, or at least suggested, is that fecal coliform is synonymous with sewage and human waste, and that's not true. Our expert provided testimony through his deposition and also his report that there are other sources of fecal coliform, including animals. And, in fact, counsel referred to a case that they cited in their reply brief, United States v. Massachusetts Water Resource Authority, which makes this very point. It actually makes two points that are relevant to this case. The first is the court says that fecal coliform is a poor indicator or marker of fecal contamination. And, secondly, it says that, in that case, the elevated levels, the spikes in fecal coliform in the reservoir that was at issue were caused by gulls, by birds that were nesting around the pond, around the reservoir in that case. But that's a disputed fact, then. You're right, Your Honor, and that's not an issue for the summary judgment. Our summary judgment doesn't dispute that, at one point, there may have been elevated levels of fecal coliform in the pond. Wasn't there one of the tenants from the apartment house who said he saw sewage going through the ditch? Your Honor, yes, that testimony occurs in, I think, 2016. It's well after the 2012 date, and it's after the last testing that was done on the property. The last testing that was done was done by Cedar Lodge's expert, Mr. Sharma. That was done in March 2015. And what Mr. Sharma did was he took seven samples of sediment from the pond, from the sides of the pond and the bottom of the pond, and also one water sample. And he sent that off to a lab, and they ran the tests on it, and they came up with various levels of fecal coliform and 16 heavy metals that were tested for. Those results showed that there were no levels of contaminants that exceeded any applicable state standards. And the ones that Mr. Sharma had invoked in his expert report and that he supposedly maintained at least up until the time that we deposed him were the recap standards, the screening standards, that had been promulgated by the Louisiana Department of Environmental Equality. The fecal coliform level at that time in March 2015 was less than five colonies per hundred mil. So if the allegation is that in 2012 it was at 2,400, it was down below five colonies in 2015. And that's the last testing that was done. Our expert did not test the pond. There was no reason to because the most recent testing showed that it wasn't contaminated. Mr. Sharma also conceded something else, both in his deposition and Dauber testimony, and that is that all of these things that he was testing for, fecal coliform, the heavy metals, they all appear in all soil, in all pond water, just as Judge Jones noted with domestic drinking water. There are times where this type of contaminant gets in the water, and that doesn't necessarily mean that there's contamination or that there's damage. Did your expert say that the levels that he found in the most current readings could be explained by what was in the soil naturally? Yes, Your Honor. Our expert, I think, said two things. First, that none of the levels in the most recent testing, whether for fecal coliform or for heavy metals, exceeded any state standard. What about the opposing expert? Did he challenge that? Did he challenge what, Your Honor? Your expert's finding. No, he didn't challenge our expert's finding regarding what the 2015 test showed because that was his own testing. It was Mr. Sharma's own testing. In fact, Mr. Sharma, after he did the testing on March 25, 2015, he wrote to Mr. Witter, and he told Mr. Witter that I've done this testing and my test results show that there's no level of heavy metals in the pond sediment that exceeds the state recap standards. Mr. Sharma conceded that up until the time we deposed him. And when we deposed him, he all of a sudden shifted and said, well, I made a mistake. I shouldn't have compared the levels that I found in my testing to the state recap standards. I should have compared them to the EPA's TCLP standards. The problem with that is that, first of all, he was wrong on what standards should be applied, but he hadn't even done the testing under TCLP to be able to offer any opinions, and that's why Judge Jackson, when he considered that testimony, held that Mr. Sharma should not be allowed to testify regarding the TCLP limits because anything he would say about that standard would be misleading because he hadn't done the testing and, therefore, the jury would be left to guess as to what any additional testing might show. One thing that concerns me is the plaintiff alleges that the apartment house is continuing to send raw sewage down that ditch. And, I mean, doesn't the landowner have the right not to have that happen? Your Honor, in theory, the landowner has that right. The issue here was that there was no damage caused by whatever type of effluent flowed from the Fairway View property to the Cedar Lodge property. That was the basis for our summary judgment, that even if Cedar Lodge is correct, that there is some discharge from Fairway View onto Cedar Lodge's property, and we don't concede that, we don't agree with that, but we conceded it for purposes of the summary judgment, that there was no proof of any damage because for a claim either for restoration or remediation, Cedar Lodge was going to have to prove that the property was contaminated. That wasn't something that we came up with. That's the allegation in the complaint. Well, doesn't the owner have the right, though, not to have a, as he described it, a foul-smelling pond that looks dead? Well, Your Honor, the only evidence of that is Mr. Witter's declaration in December 2012. We've obviously briefed the extent to which that is a self-serving and conclusory declaration. He's a party, or he's a representative of a party, isn't he? He's both. Isn't a litigant's testimony always self-serving? We use that term as though it's pejorative. He's a litigant. He's got a position, and so his testimony, of course, is going to be self-serving. Well, that's true. And if credible, could be sufficient. But in this case, the district court, and we've cited the authority that allowed the district court to reach this conclusion, the district court found that his testimony was against the overwhelming weight of the evidence. And, in fact, it's not even consistent with a claim for damages or for the particular claim for damages in this case for two reasons. What about injunctive relief, though? Well, Your Honor, that was something that wasn't originally pleaded but was brought in later on. And, again, to obtain injunctive relief, CDER has to prove some damage. And in this case, it did not prove any damage. As counsel suggested, there is a natural drainage onto the property. It doesn't only drain from Fairway View. It drains from everything west of us as well. One of the things that our expert did was he tested the runoff from a golf course, which is on the other side of the Fairway View property, so further to the west. And he found elevated levels of fecal coliform coming off the golf course. The day he tested, it was 1,900 colonies per 100 mil. So there is— Does Louisiana not allow a landowner in the position of CDER Lodge to prevent the water from flowing through that ditch onto his property? Your Honor, I don't believe there is a categorical prohibition against that. One of the things that— I don't want to get you off on a rabbit trail. A business opportunity. You're saying that the only evidence in support of loss business opportunity is Mr. Witter's testimony. And Judge Jackson lined up, you know, e-mails and so on from Harvest, and Mr. Jacoby says that those are not consistent and they are not probative. What do you respond? Your Honor, first of all, I don't think that Mr. Witter's testimony supports the business loss claim. I'll address that in a minute. But I also disagree that the Harvest Partners' testimony is contradictory. Harvest Partners' testimony came in through the testimony of its principal, the corporate representative, Mr. Barnett. And we asked Mr. Barnett what the impact was of the alleged contamination on the development deal. Mr. Barnett said that Harvest Partners, in doing other development deals previously, had encountered environmental issues and that the environmental issues, whatever they were, and Harvest Partners didn't know the extent to which there were any environmental problems, but said that those didn't stop Harvest Partners from being willing to proceed with the negotiations. We put in evidence two e-mails from Harvest Partners by Blaine Lee, who was one of the principals from Harvest Partners negotiating the deal. And the first e-mail, which is dated January 28, 2013, the day before the lawsuit was filed, Mr. Lee said that he understands that there may be an environmental issue, and he offered his time and his knowledge to assist Cedar Lodge in identifying and remediating any environmental problem. Harvest Partners didn't conduct its own investigation to determine whether there was an environmental problem or not. It just took Cedar Lodge's information as it was given and said, if that's a problem, we'll help you work through it. About a week later, Mr. Lee sent another e-mail to Cedar Lodge, and in that e-mail he said that he was going to continue working on the development documents and marketing so that no time would be lost in moving towards development while Cedar Lodge addressed whatever the environmental problem was. Cedar Lodge ignored that. It ignored Harvest Partners' offers of assistance, and it took no steps on its own to remediate the property to allow the negotiations to continue. Instead, what happened was Harvest Partners continued to send documents to try to document the deal to Cedar Lodge, and Cedar Lodge ignored it. Harvest Partners prepared a contribution agreement, a joint venture agreement, sent them all over to Cedar Lodge, and didn't receive any response. And what Mr. Barnett testified was that after a period of time, and we know that Harvest Partners worked on this at least into April of that year, Harvest Partners became frustrated because it was getting no communication, no response from Cedar Lodge, and Harvest Partners assumed at that point that Cedar Lodge was no longer interested. Okay, and then this gets into the question of the standard of causation, because does Mr. Witter have a cause of action only if, in his view, the pond was the sole cause, or could it be one of various causes? Your Honor, first of all, Mr. Witter didn't provide any clear testimony on what caused the negotiations to end. In his deposition, we asked him how did they end, when did they end, and he didn't know. What he said in his deposition wasn't, I was afraid of the potential contamination and what my future reputation would be in the community. He said that the negotiations ended because Fairview's counsel would not cooperate, and by that he meant Fairview's original counsel, not our law firm. Secondly, that Harvest Partners had spent a lot of money on trying to work towards the development. And third was that Mr. Witter didn't see any resolution to the problem. That's what he said. You mean the problem of contamination? I assume that's what he meant. But there's no evidence that Cedar Lodge ever did anything to determine whether they could remediate the property, whether they could build a dam to divert the water somewhere else. None of that was ever done. What Cedar Lodge decided to do instead of trying to work through this issue and continue the negotiations in which Harvest Partners was prepared to stay was they filed a lawsuit. That was the response. And so from our point of view, whatever alleged contamination that there was was not a cause in fact of the negotiations ending because Harvest Partners was prepared to continue the negotiations. In addition to that, it is not an appropriate legal cause of the negotiations ending because what we'd be saying then is that Cedar Lodge can decide unilaterally to shut down these negotiations even though they could have continued, that the negotiating partner was prepared to continue, and then seek damages for it. Even beyond that, Your Honor, just to conclude on the business loss claim, this Court may also affirm the district court because any losses that were going to be claimed in this suit were purely speculative. No agreement was done. No agreement had been written, and Cedar can't tell you what its interest in this development, if it had ever come to fruition, would have looked like. We ask the Court to affirm the district court's dismissal of all claims against Fairway View. Thank you, Mr. Jacoby. Good morning. David Bordelon for STS. Sorry, Bordelon. David Bordelon. Excuse me. Your Honor, there wasn't any direct argument with respect to the dismissal of STS. STS is a small service company that maintained a lift station for $95 a month on the property. The Court applied the legal standard of reasonableness. The plaintiff's own expert, Mr. Ferris, said that he thought STS complied with its contractual arrangements. What did maintenance include? Was it a monthly thing where they'd come out and put in filters and make sure trains were open and whatnot? Yes, sir. So it was a regular monthly procedure that they employed to make certain that equipment worked properly? Yes, sir. Did not include repair? In the instance of something that needed to be repaired, what was their obligation? Well, if there was, and I don't believe there was such an instance, but if there was, they would have signed a separate contract to do that. Okay, but isn't there some testimony in the record or some evidence in the record that they had come out more than once a month at a point in time because they were having additional problems that seemed to go above this normal monthly maintenance? They had occasionally addressed a problem, yes, sir, but the judge's finding was that contractually they did what they were supposed to do and they were not legally required to remedy the system that the plaintiff was complaining of. And really none of these, the plaintiff's expert actually changed his testimony after summary judgment was granted and made legal conclusions about STS. Wasn't there some evidence that the lifts weren't working properly? Yes, sir. Occasionally the lifts would not work properly, but that was not something that they were, they weren't hired to reconstruct the lifts or any other part of the system. Wasn't part of your job to repair the lifts if they weren't working? Well, yes, sir, but as far as the lifts were concerned, they did not act unreasonably. They made sure the lifts were working as well as they could. The witness that said he saw sewage flowing into the drainage ditch, did he say that was coming from a manhole cover? Yes, Your Honor. Now what would that have to do with STS and the lift? Well, first of all, that was beyond the last testing, so I'm not sure what the relevance of that would be. That was more like 2016? Yes. Oh, okay. But, I mean, just from a plumbing standpoint, do you happen to know? I believe that was on the other side of the ditch, which would not have been affected by the lift station. The lift station was gravity was to lift the sewage. Was it within the apartment complex? It was allegedly within the apartment complex. But, I mean, a manhole relates to the city's pipes, doesn't it? Right. Okay. That's the one. So I would ask that you clarify. Thank you. Okay. Thank you. Now Mr. Jacoby. Your Honor, that manhole was not a city manhole. That was directly down from the lift station and right at where there is a design flaw that caused the sewage to back up and overflow out. There's erosion throughout that lift station that shows overflowing of sewage. There are streaks from that manhole that go directly down into the ditch that go directly into our pond. And the testimony of three different residents right over there is not just that there was an incident of overflow. It was that, quote, a stench from the day I moved in until the day I left and that every day I woke up and I would just about gag. They said that that was sewage. It was overpowering. It was blasting out. We learned about that later on. This is corroborated by the Department of Health and Hospitals even got involved. They performed an inspection here not on our request but on the request of residents from their own Fairway View apartments. They issued evidence in the form of a report, e-mails, and photographs showing discharges of raw sewage. This was constant. Relating to background, the contamination found there, our briefs don't get into it, but you did ask about the background levels. Background was absolutely nowhere near it. Our experts are debating that very heavily. The contamination found in the pond here was nowhere near background. And I could get into that, but I think that it's because that's a fact-heavy issue. I think that belongs with the jury. Well, the judge found no restoration because he found no contamination, right? Yes, and I think that it was wrong to apply RECAP as sort of a standard there because, for one, state environmental regulations do not supersede civil code. That's civil code article number one on the primacy of legislation, and number two, RECAP itself disclaims the use of its standards. But I thought your expert was originally relying on the state standards. He did mention that. He did two things. He found that there was sewage contamination, and he did compare them to RECAP. But in comparing them to RECAP, he's making a legal conclusion about whether there's contamination rises. But what's your basis for contamination? Is it just some expert saying, well, it's lower than the state standards, but it's contaminated anyway? It's lower than the state standards, but it's far higher than what background is for the area. And that demonstrates in their own expert. And that's inherently contaminated? When you damage another person's property, you're not allowed to ‑‑ Well, let me just, I mean, just from my dumb layman's perspective, I mean, you may have a clear trout stream running through in a beautiful mountainous area, and right next to it you have a little ditch with puddles in it because it only gets rainwater and the vegetable matter is deteriorating and it stinks. But that doesn't mean that the natural pond is contaminated. Right? I would think it would be a de minimis sort of thing. I mean, there's got to be some objective background other than, well, it's not comparable to the rest of the area. I think that the standard would be better suited for the background and what constitutes background, which is a matter of debate here, because if the background says that you can have 100 fecal coliform, says that it's typical to have 100 fecal coliform, we see fecal coliform going into our pond and we test it and it's exponentially higher than that, then we should be able to go to a jury and say this is far worse than background and they're the culprits, they're the ones responsible for it, and not to implement. Now, that said, there are regulatory exceedances, both of arsenic and there was the fecal coliform at one point, but it spikes and goes up and down as there are pulses into the pond. I did want to address one other aspect about the reasoning that Mr. Witter broke off communications. There are no other reasons even asserted by the defendants for him to break off communication other than the contamination problem. Well, he said that they said, he said that Mr. Witter's deposition says that he couldn't get along with someone at Harvest Partners and I can't remember the second point, and then no end to the problem. So there were at least three articulated ideas, two of which had nothing to do with alleged contamination. And on what basis did he say there's no end to the problem anyway? That there's no end to the problem? Yeah. The contamination was ongoing and they were refusing to address it. But this is all in March. This is within one month of when they brought it up. Right. As soon as that contamination problem happened, you can't remediate a pond if they're continuing to dump raw sewage into that pond. And so our efforts to fix the problem was to send a demand letter demanding that they address it and then finally to file sue. Right. Okay. Well, thank you very much, and we'll be in recess until 9 o'clock tomorrow morning.